UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| The ESTATE OF MICHAEL BOURQUIN, by and through JUDY BURCH, the personal representative for and on behalf of Plaintiff Decedent MICHAEL BOURQUIN, et al, <br><br> Plaintiff, <br><br> v. <br><br> PIERCE COUNTY, et al, <br><br> Defendant. | CASE NO. C16-5141RBL <br><br> ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #26]. Plaintiffs are the mother and children of Michael Bourquin, and the representative of his estate. Defendant Pierce County is the employer of Defendant Chad Helligso, who shot and killed Bourquin during a violent encounter in the early morning of February 1, 2014. As a result of Bourquin's death, plaintiffs filed a Civil Rights Act lawsuit alleging that Defendants' violated Bourquin's Fourth Amendment rights. Plaintiffs also bring a loss of consortium claim. In this motion, Defendants seek dismissal of (1) all Fourth Amendment claims against Deputy Helligso as Deputy Helligso did not commit a constitutional violation, and even assuming otherwise is

entitled to qualified immunity; (2) the *Monell*[1] claim against Pierce County as Plaintiffs cannot establish the necessary elements of municipal liability; (3) all claims made by Plaintiff Judy Burch as Judy Burch lacks standing to sue; (4) any state claim of loss of consortium as that tort, and any other state tort claim, is barred by RCW 4.24.420; and (5) any Fourteenth Amendment claim for loss of companionship because there is no evidence that Deputy Helligso acted with a purpose to harm.

## I. FACTS

Michael Bourquin, a suspect wanted on felony warrants, implicated in a murder, and a known associate of a person who had taken a death threat out on the two officers here, openly sprayed officers directly in the face with bear pepper spray during a traffic stop.

As a result, officers were left blinded, defenseless, gasping for breath, and were forced to use deadly force in order to save their lives.

Deputy Helligso and Olson both started working as Pierce County Sheriff's Deputies in 2006, and worked as Corrections Deputies prior to that. Both of them went through two separate law enforcement academies where they were exposed to OC-10 spray (oleoresin capsaicin, otherwise known as pepper spray or OC spray). Since 2011 they have worked together as a two man car, four days a week, 10-11 hours a day.

At the time of this incident, Deputy Helligso and Olson patrolled the South Hill area, with a primary emphasis on the west side – the Parkland/Spanaway area. The Parkland/Spanaway area is a high traffic, high call volume area known for criminal activity such as methamphetamine, theft, burglary, stolen vehicles, identity theft and firearms. Because of this

---

[1] *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

work environment, Deputy Helligso is familiar with the drug methamphetamine and its effects, having daily contact on patrol with individuals under the influence of this drug. In his experience it causes highly unpredictable and dangerous behavior.

Deputy Helligso has been exposed to pepper spray before. In his experience, "You can't breathe. You start losing your breath. You can't talk. And within seconds you're basically completely incapacitated. You can't breathe. You can't see. Nothing." (Helligso Decl., Dkt. #32). The effect can last for hours and for him personally, he is unable to see for 20 to 30 minutes at a minimum. The pain is said to feel like a "hot fire poker being struck directly into your eye and left there. Eyes are clamped shut due to the pain." Id. Olson's prior experience with pepper spray is that it is completely "debilitating." (Olson Decl., Dkt. #29).

One of the areas Olson and Helligso routinely patrol within Spanaway is a well-known trailer park located at 180th and Pacific Avenue, hereinafter referred to as the "trailer park."

Around April 17, 2013, Deputy Olson and Helligso arrested Daniel Smith, a resident of the trailer park, for possession of a large amount of narcotics with intent to deliver. At the time of the arrest, Daniel Smith threatened Deputy Helligso and Olson, telling them that he would be looking for them when he gets out. During a search of the car following his arrest, officers found a large knife, a taser, drugs and scales, and two daggers. Olson reported that he took Smith's threats seriously based on his prior contact with Smith and the weapons found in the vehicle at the time of arrest.

While in jail on those charges, Daniel Smith took a "hit" out on the lives of Deputy Helligso and Deputy Olson. According to an investigation, Daniel Smith made phone calls to his girlfriend, Eileen Lewis, and the calls were recorded on the jail's monitoring system. In the calls, Smith said that he knew a guy named "Dougie" was getting out on Friday and that:

. . . between me and you. Olson's already fucking done. Did you forget who I sold the SK 47 to .. or the SKS. Okay, I sold it to Dougie's dad. Yes . . . . Fucking Olson's badge is gone.

(Olson Decl., Dkt. #29).

As a result of the phone calls, detectives contacted Douglas Reed, suspected to be "Dougie," who was in the same cell block as Daniel Smith and subject to be released soon. According to Reed, Smith was openly talking about setting up Deputy Olson outside the trailer park where he lives. Reed said Smith's plan was to call 911 and make a false drug complaint occurring outside the trailer park. Smith says he would then ambush Deputy Olson and shoot him with an automatic weapon. Deputy Olson and Helligso also had good rapport with Douglas Reed and he confirmed the death threat to them.

On April 29, 2013, Deputy Brown contacted Deputy Olson and made him aware of the above threats.

On June 7, 2013, in Pierce County Superior Court, a judgment and sentence was entered against Daniel Smith on the charge of Felony Harassment, the factual basis for which was the death threats against Olson and Helligso. Smith had a long criminal history, with the maximum number of offender points, and was sentenced to 60 months in prison for the threats against Deputy Heligso and Deputy Olson. As part of the sentence he was ordered to have no hostile contact with either deputy.

As a result of Smith's threats, a "safety tag" was placed on the trailer park prior to February 1, 2014. A safety tag means that an area is known as an extreme threat to officers and requires that a minimum number of officers be present.

Prior to February of 2014, Deputy Olson arrested John Arakaki on charges unrelated to this lawsuit. Arakaki considered himself a father figure to Bourquin. As Olson transported

Arakaki to jail Olson chatted with him. During their conversation Arakaki said, "Hey, you know, I've got to get something off my chest, you know." And Arakaki said, "You know about that Christopher Virdell homicide." . . . "Well, I had somebody that confessed to me that they in fact killed Chris Virdell." When Olson asked, "Really?" Arakaki said, "Yeah, . . . [a]nd I don't think it's right. It's not right, you know." He said, "I look at this kid like a son, you know. I'm like a father to him and . . . Michael as a son, you know." Olson asked, "Well what happened?" And Arakaki said, "You know, he told me . . . Michael Bourquin admitted to me that, you know, he stabbed Chris Virdell two times." And Olson asked, "Are you sure it was Michael Bourquin?" Arakaki stated, "Yeah. That's who I talked to. He told me that he did it, and you know, it's been going through my head, and you know, I just – something's got to be done about it. You know the family needs closure." Olson told him that was honorable and he asked him if he would like to speak with a detective and Arakaki agreed that he would. (Olson Dep. 29-31).

On January 26, 2014, just days before the officers' encounter with Michael Bourquin, Deputy Olson sat in on the interview between John Arakaki and Detective Tim Kobel where Arakaki detailed Bourquin's involvement in the death of Virdell.

Based on Arakaki's interview, Michael Bourquin was considered a prime suspect in the murder of Christopher Virdell. Just prior to this, Detective Kobel – lead investigator of the Virdell murder – instructed Deputies Olson and Helligso to bring Bourquin in for questioning regarding the murder if they had an opportunity. On February 1, 2014, Deputy Helligso was aware that Bourquin was considered the prime suspect in Virdell's death. Based on information Helligso had, it was believed that Bourquin stabbed Virdell to death in Larry Smith's trailer and that Larry Smith, Daniel Smith and Eugene Doiel, were all present at the time of the murder. (Helligso Dep. 50-53).

On January 31, 2014, a felony warrant was issued for the arrest of Michael Bourquin, Douglas Reed, David Young, Casey Long and Denise Smith for the felony crimes of UPCS with intent to deliver methamphetamine, identity theft, and possession of stolen property. Olson was also informed that Detective Kobel wanted to question Bourquin regarding the death of Christopher Virdell. (Olson Dep).

On February 1, 2014, Deputies Helligso and Olson saw Eugene Doiel's truck exit the trailer park just after midnight. The deputies confirmed that Doiel's license was suspended and they suspected that Bourquin might be with him. At about 12:03 a.m., Doiel pulled out of the trailer park onto 180th and Pacific Avenue; the deputies pulled in behind the truck and activated their emergency lights. Olson believed he could see three people in the truck, including Eugene Doiel in the driver's seat. Doiel pulled over at 174th – just east of the avenue. Olson approached the driver's side of the vehicle and contacted Eugene Doiel, while Helligso went to the passenger side to see if he could confirm that the passenger was Bourquin. Olson informed Doiel that his license was suspended. Olson looked into the truck and recognized Bourquin's girlfriend, Falisha Lewis in the center seat and Michael Bourquin in the right passenger seat. As Bourquin turned his face away from Helligso, Olson said to Helligso, "*That's Michael Bourquin*." (Helligso Dep. 78; Olson Dep. 16). Helligso then opened up the door and told Bourquin to step out. Instead of stepping out, Bourquin reached between he and Falisha with his hands, and turned his entire body towards her concealing what he was doing from Deputy Helligso's view and at that point Falisha screamed, "*No, Mikie, No*." (Helligso Dep. 22:3-25, 78:22-25, 79:1-3). Olson saw Falisha acting weird, putting her head on Doiel's shoulder, like she perceived something was about to happen. (Olson Dep. 21:14-19). Helligso felt that Bourquin's behavior

was unusual as was Falisha's screaming and so he grabbed Bourquin by his coat and pulled him out of the car. (Helligso Dep. 22, 23,79).

As soon as Bourquin exited the truck, he crouched down and started digging at something in his waist line. Helligso then placed Bourquin in a bear hug, with Bourquin's arms pinned at his side from above the elbow. During the struggle, Helligso's flashlight dropped. Helligso tried to take Bourquin to the ground, but Bourquin managed to stay upright. As Helligso continued his efforts to take Bourquin to the ground, he suddenly saw and felt a "gigantic funnel cloud of the bear spray . . . it got me up the nose. It went in my mouth, and I took, like, a second hit . . . [then] I see him turn his head towards Chris, who's on his right," . . . . [and] I see the funnel cloud shift and hit Chris directly in the face." (Helligso Dep. 80).

Helligso then threw Bourquin to the ground. Bourquin hit face down on the ground and he was trying to push himself up. He was not staying down. Helligso fired his gun hitting Bourquin six times. Each of the shots was potentially lethal.

Olson tried to find a cloth in the back of his trunk to wipe his eyes while he went for cover. (Olson Dep. 20:16-25). He then closed his eyes and "got on the radio and said that, you know, '*Shots filed. We've both been pepper sprayed.*' (Olson Dep. 20:1-10).

Deputy Olivares was the first to arrive on the scene as back-up. When he pulled up on the scene, he could see Olson and Helligso's patrol car and a red pickup in front of the patrol car. He heard all kinds of screams. Olivares saw Deputy Helligso "kind of holding his eyes and just almost spinning in circles, almost looking like he was trying to figure out where he was. And Deputy Olson was standing at the car, trying to call deputy Helligso back, and he's covering his eyes at the same time." Helligso had his weapon drawn in a "low ready," available in case he needed to use it because it appeared he couldn't see. (Olivares dep. 21:4-20.) The driver of the

truck was screaming and yelling and cussing and the female passenger was screaming inside the truck.

After Olivares secured the safety of Helligso and Olson he turned his attention to the occupants of the vehicle, drew his weapon, and held the driver and passenger at gunpoint because the driver kept screaming, yelling, cursing and putting his hands back in the vehicle. Olivares kept instructing the driver, "*Keep your hands where I can see them. Keep your hands where I can see them.*" (Olivares Dep. 18:1-2). Deputy Huber then arrived and asked Olivares what to do next. Olivares stated, "*We need to get the driver out. He's putting his hands back in the car. He's not listening to my commands. We need to get him out and get him to handcuffs immediately.*" (Olivares Dep. 18:1-9) (Huber Decl., Ex. A). Deputy Olivares then went up to the truck, opened the door and took Mr. Doiel to the ground. Deputy Huber arrived to assist. As soon as Olivares went to place handcuffs on Doiel, Doiel grabbed Olivares' hand and kind of pulled it towards his chest, pulling Olivares on top of his back. Olivares started giving commands of, "*Let go. Let go.*" (Olivares Dep. 18). Huber looked over and saw Doiel placing his hand under his waist which immediately caused fear and concern for Huber, given the circumstances, and he struck Doiel on the thigh with his flashlight to help gain control. Still Doiel wouldn't let go so Olivares gave him a couple of strikes to the ribs as a technique to have his hands released, and after a couple of strikes, Doiel let go and they were able to get him in handcuffs.

Once Doiel was secured, Huber and other deputies turned their attention to Falisha Lewis. Lewis ignored all commands to exit the truck and Huber was forced to grab a hold of Lewis and physically extract her from the vehicle in order to place her under arrest. During the attempt to arrest Doiel and passenger Lewis, Washington State Troopers Gunderson and Knox

arrived to assist. When the troopers arrived on the scene they saw Helligso and Olson who were suffering from an "obvious exposure to OC spray." As they approached the suspect vehicle they could smell the OC spray lingering in the air and it caused Trooper Gunderson to cough and both troopers' eyes began to water.

Olivares transported Doiel to the precinct. Doiel started complaining about the pepper spray, saying that he had received some overspray and he was having trouble breathing.

The can of bear spray was removed from Bourquin's chest for safety precautions and collected as evidence. A knife was recovered in the area of the initial struggle between Bourquin and Helligso and a knife was also located on Bourquin's person, along with a sheath.

An autopsy revealed a total of six gunshot wounds to the anterior chest area and one wound to his back, which resulted in perforation of the lungs, laceration of the liver and heart and multiple rib fractures. There were no other injuries noted, including no bruises, cuts or scrapes.

The medical examiner could not determine the order of gunshot wounds. All gunshot wounds had the potential to be fatal. Toxicology testing showed a methamphetamine concentration of 2.1 mlg/L, and amphetamine of 0.23 mg/L. The medical examiner concluded that Bourquin was intoxicated on methamphetamine at the time of his death.

## II. DISCUSSION

**A. Summary Judgment Standard.**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner*, 780 F.2d 727 (9th Cir. 1985). A "genuine" issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id*. A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers Int'l Ass'n*, 804 F.3d 1472, 1478 (9th Cir. 1986). A party seeking summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Only after the moving party had made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *Id*. The burden on the moving party may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Id*. At 325.

If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which she bears the burden of proof at trial, summary judgment may be granted. *Id*. at 322-23. Substantive law dictates which facts are material. *Anderson*, 477 U.S. at 248. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Id*. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061

(9th Cir. 2002). The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial, *Celotex*, 477 U.S. at 325, and the party cannot manufacture a genuine issue of material fact so as to oppose a motion for summary judgment merely by making assertions in its legal memoranda. *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235 1238 (9th Cir. 1982); *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978) (genuine issues are not raised by mere conclusory allegations). In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**B. Fourth Amendment Claims Under 42 U.S.C. § 1983**

Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1983) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). To prevail on a claim for relief brought pursuant to § 1983, a plaintiff must assert that he suffered a violation of rights protected by the Constitution or created by federal statute, and that the violation was proximately caused by a person acting under color of state or federal law. *Bradford v. City of Seattle*, 557 F.Supp.2d 1189, 1197 (W.D. Wash. 2008); *see WMX Techs., Inc. v. Miller*, 197 F.3d 367, 372 (9th Cir. 1999) (en banc). This requires the plaintiffs to allege facts showing how a specific individual violated a specific right, causing the harm alleged in the plaintiffs' complaint. *Bradford*, 557 F.Supp.2d at 1197 (citing *Arnold v. International Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)).

A Fourth Amendment claim of excessive force is analyzed under the framework outlined by the Supreme Court in *Graham v. Connor*, *supra.* All claims that law enforcement officers

have used excessive force – deadly or otherwise – in the course of an arrest must be analyzed under the Fourth Amendment and its "reasonableness" standard. *See Graham,* 490 U.S. at 395; *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992) (as amended). That analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing government interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Graham,* 490 U.S. at 396.

Whether the use of deadly force is reasonable is highly fact-specific, but the inquiry is an objective one. *See Scott v. Harris,* 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("Although respondent's attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of 'reasonableness.'"); *Graham,* 490 U.S. at 397. The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was objectively reasonable in light of *all* the relevant circumstances confronting the officer. *Id.;* *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) (emphasis in original).

In assessing reasonableness, the court should give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight". *Graham,* 490 U.S. at 396; *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). The most important of these factors is the threat posed by the suspect. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). These factors are not exclusive, and the Court should consider the totality of the circumstances. *Mattos v. Agarano,* 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Michael Bourquin posed an immediate threat of death or serious physical injury to both officers sufficient to justify the use of deadly force by Deputy Helligso. Given the circumstances surrounding the shooting of Michael Bourquinn, no reasonable juror can conclude otherwise. The defendants acted reasonably in administering deadly force.

**C. Qualified Immunity**

Qualified immunity is more than a mere defense to liability; it is "an entitlement not to stand trial or face other burdens of litigation," and "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). For this reason, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

Qualified immunity encourages officials to exercise their discretion without the fear of liability when the state of the law is unclear or their actions are reasonable under the totality of the circumstances. *Carlo v. City of Chino,* 105 F.3d 493, 500 (9th Cir. 1997). As such, immunity from suit must be granted if the discretionary function of a public official did not violate clearly established law of which a reasonable person would have known. *Harlow,* 457 U.S. at 818-819.

The traditional determination of whether an officer is entitled to summary judgment based on the affirmative defense of qualified immunity requires applying a three-part test. *Saucier*, 533 U.S. at 201-02. Under *Saucier*, courts consider whether "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right?" *Id.,* at 201. If the answer is no, the officer is entitled to qualified immunity. If the answer is yes, a court proceeds to the next question: whether the right was clearly established at the time the officer acted. *Id.* at 201-02. If the answer is no, the officer is entitled to qualified immunity. If the answer is yes, the court is required to answer the final question: whether the officer could have believed "reasonably but mistakenly … that his or her conduct did not violate a clearly established constitutional right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). These questions can be addressed in whatever order the order the Court finds most efficient. *See Pearson v. Callahan*, 55 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ["W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory"). Ultimately, if an officer's actions do not amount to a constitutional violation, the violation was not clearly established, or his actions reflected a reasonable mistake about what the law requires, he is entitled to qualified immunity.

As stated before, there was no constitutional right violated in this instance. If a violation occurred it is a violation of a newly minted version of the law on Fourth Amendment principles and the officer would join a chorus of other fellow officers in saying: "I didn't know that was the law." Qualified immunity applies.

**D. *Monell* Claim**

In order to establish municipal liability, plaintiff must show that the defendant acted pursuant to an official custom, pattern or policy that violates the plaintiff's civil rights, or that the County ratified the unlawful conduct. *See Monell*, 436 U.S. at 690-91. Further, plaintiff must

demonstrate that the defendants' policies were the "moving force" behind the constitutional deprivation. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996). *See also, Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1388-89, 137 L.Ed.2d 626 (1997); *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Where a claim of municipal liability is premised upon an alleged failure to act (such as an alleged failure to train or supervise), the plaintiff must also prove that the policy that caused the deprivation was adopted with "'deliberate indifference' to the plaintiff's constitutional rights." *Van Ort*, 92 F.3d at 835 (noting that these requirements have been applied to inadequate training claims, inadequate supervision claims, inadequate hiring claims and applying these standards to inadequate "monitoring" claims). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691.

In this case, Plaintiffs have not clearly identified any theory or constellation of facts that justify a proceeding against the County. The remaining claims by the plaintiffs are all damage theories derivative of the Excess in Force claim. The liability questions are decided against plaintiff, and therefore the derivative claims are moot.

### III. CONCLUSION

For the foregoing reasons, the Court dismisses all claims against Deputy Helligso because his use of deadly force was objectively reasonable under the totality of the circumstances that he faced on February 1, 2014. Even assuming, *arguendo*, that there was a constitutional violation, Deputy Helligso is entitled to qualified immunity because it was not clearly established that his actions were unlawful at the time of the incident. The Plaintiffs' *Monell* claim against the County is likewise dismissed for failure to present any evidence of a

County policy or custom that resulted in a constitutional violation. The Motion for Summary Judgment [Dkt. #26] is **GRANTED** and the case is **DISMISSED** with prejudice.

Dated this 11th day of April, 2017.

Ronald B. Leighton
United States District Judge